Good morning, Your Honors. May it please the Court, I'm David McClain, and I represent Jesse Howard. I represented him when I was with the Public Defender. He's present in court today. He's unchackled. And I was the one who argued it before the Magistrate Court, and I remember from that hearing, I argued it for several people, and the clients, Mr. Howard, conveyed to me during this argument that he did feel humiliated because he was only accused of a crime at that time, not convicted. I'll move to the search issue. Yes, Your Honors. The issues in this case are not just important for Mr. Howard, who's facing 18 months in custody, because that was the sentence he's received, and he's been out on bail pending the entirety of the case. But it's important for, I would submit, Your Honors, for poor communities, minority communities, because I think a lot of what drove Judge Fee's decision on this case involving the probable cause issue and the warrant issue involved because Mr. Howard happened to live in a minority community, and I think that was very important in his decision. And I also would submit that it was inappropriate for his decision-making in this case. Was it a minority community or was it a community where there had been recent episodes of gang violence? Well, answering that question, what came up at the hearing was that there was a gang-related murder that occurred 12 days before, 10 to 12 blocks away from the street where Mr. Howard resided. Now, it wasn't on the same street. There was no evidence that Mr. Howard was involved in gang-related activity. They just saw him on the street, allegedly, and they decided to stop him. And they were on a high proactive patrol in the area because of that murder, but I don't think it had anything specific with that block and even with that time period. I would submit, Your Honors, that 12 days before and 10 to 12 blocks away is quite a distance in time, and we all know that. Was that location one was perceived as being within the territory of one of the gangs involved? Yes, it was perceived. Because you've got a high-intensity patrol underway, and if a patrolman who's there because of this high-intensity activity happens to see what the patrolman perceives to be criminal activity, should the patrolman stop and think, well, is this related to gangs or not, before proceeding to investigate? Well, that begs the question, Your Honor, whether they even perceive criminal activity. I understand that. It's conceded. But the suggestion that the judge's decision is influenced by this being a minority neighborhood is not one that I think is, in those terms, supported by the record. What is supported is the notion there's intensity patrol because of this episode. And you can argue whether or not the intensity patrol was justified, but there was intensity patrolling going on, and the officers saw something which, and then we can get to that debate, may or may not have justified what happened after that. Well, it seems curious that it's always these high-intensity patrols when there happens to be a murder. It always occurs in other neighborhoods. Let's get to the facts that relate to probable cause. Yes, Your Honor. Because that's what affects your client. From what I understand of the government's testimony was they see him walking, and he notices them and throws a gun over a fence into a yard. Well, it was his own house, Your Honor. Their testimony by only one police officer who happened to be the driver of the car farthest away from the side of the street that they were patrolling. The house was on the north side of the street. They were patrolling going westbound down the street. The driver is the farthest away. The other officer in the passenger seat didn't even see my client until he was in the driveway of his own property. So what about the guy in the driver's seat? If the driver says, I was looking that way and I saw it, how could he be going west and I can look to the north? The question is, did he have a line of sight? Well, he probably did have a line of sight, Your Honor, but it would make sense that two patrol officers, one would be looking naturally to the right or the north side, and that would be the passenger officer, and the driving officer would be looking to the south. Is there anything in the record that tells us that when there are two people in the car, that the one at the driver's seat normally looks to the left and the other one normally looks to the right? Because human experience, I don't think, necessarily supports that. People look at what they're interested in looking at as they're driving forward. Well, that could be, Your Honor. I don't know what's in the record, but there's nothing unusual, I don't think, about someone in the driver's seat of a car looking off to the right as opposed to wearing blinders. Yes, Your Honor. Well, going to the record, we had five declarants testify that Mr. Howard was sitting on a milk crate in his driveway when one of the officers approached and went onto his driveway, and that triggered the flight while he was on his own driveway going into his house. And when he was heading towards his house, he tossed the gun over the roof of his house, and it landed in the backyard. Now, we would submit that the court committed clear error in making a finding that he was on the driveway itself, and we say that for a number of reasons, Your Honor. One of the reasons is because there was two officers, and the officer closest didn't see him until he was on the driveway. There was a conflict in the evidence. Clearly, there was a conflict in the court. Police testified that they were in the driveway. Police testified what? One police officer testified that he was on the sidewalk. The other police officer closest did not testify to that in his first observation when he was in the driveway, and that's critical for Your Honor's determination on probable cause because if you're on your own property minding your own business and the police suddenly approach at night, you know, flashlights drawn. The district court recognized that but found that the police officer was more credible. More credible as opposed to five declarants who testified contrary to the officer, and I'd also, the court should note that two of those declarants, the government didn't even bother to cross-examine. One of those declarants was in the driveway himself, and the police officers, we have a situation where the police officers both testified that they were going outside the property, going westbound, and they ignored the other individual that's in the driveway itself, and yet they detained him during that incident. It just doesn't make sense. If the person in the driveway who testified that the officers came through the fence and one of them detained him, he would have left the scene. If the officers are going westbound past him and don't even enter on the property and are solely focusing on Mr. Howard, it just doesn't make sense the way the police officers explained it. And so it's not just that, and basically the credibility of our declarants, they were only challenged basically because they were acquaintances or they knew Mr. Howard, but that's the case. Then no one from the defense would ever prevail on a motion to suppress, and we'd have one officer say one thing, and that would be the end of the story. And I think you just concluded that their story was more credible. But on appeal, we've got a problem. We establish a rule that says, well, you can come up with five or six witnesses to contradict the officer. Then as a matter of law, we can say it's clearly erroneous to believe the officer. Surely that's not what you're saying. No, no, that's not the law. I would just ask the Court to look very carefully at the declarations and the logic underlying the finding by the Court. I don't think that the logic carries the day, because common sense would dictate that one of the officers would go and detain one person who's in the driveway, and that means entering on the driveway. And so if the police enter onto the driveway, then the flight is not provoked anymore. And the Court was concerned with that. That was kind of the gravamen of the district court's decision, whether Mr. Howard was on the driveway or was he on the sidewalk. And what's interesting, another interesting fact that's clear from the record, undisputed, he was not arrested for carrying a concealed weapon. He was not arrested for carrying a weapon in public. He was arrested as a felon in possession. There was no evidence in the record they even knew he was a felon until they took him to the police station. Okay. We have less than a minute left. Okay. Well, going on to the warrant issue, which I think is an issue this Court can more easily address, because it's not a conflict in the testimony. It's the issue of whether the police, knowing that the weapon is on the property in the backyard, knowing Mr. Howard entered the house, can therefore search for the weapon on his property without a warrant. After watching him run over the roof? Right. Into the backyard. Now, the government claims somehow that there's a dispute as to whether this weapon was, but there's no evidence that the police searched anywhere, and the evidence is clear. They only searched in the backyard. The evidence is that there was 14 officers who surrounded the house. What they should have done, and the Supreme Court upholds this principle, is that they secure the premises, that they can order the people outside the house, and which would have been the smart thing to do. If you really believe that this guy's a dangerous man running into the house, why are you allowing him to stay in the house 10 to 20 minutes while you're searching for a gun? Counsel, you have Easter time. Thank you. May it please the Court. Good morning. Bill Crowfoot for the United States. The appellant asks this Court to find that the district court was mistaken in its finding of probable cause and exigent circumstances in this case. And based on the evidence before the district court, it is clear that the district court's finding was reasonable, and the district court in its order actually discussed the evidence introduced in testimony and declaration of all but one of the witnesses that either appeared at the suppression hearing or actually submitted the declaration. And with respect to the last witness that the Court did not discuss and that the government did not cross-examine, in the government's papers we address the issues with respect to the plausibility of that witness's testimony, that was Mr. Williams, as well as what he was in a position to be able to see, given the pictures that were submitted at the suppression hearing by the defendant, showing where the defendant was located at the time of this incident. What precedent do we have that bears on whether police should go immediately search to get the gun that they see thrown or whether they need to secure the house and get a warrant? Your Honor, unfortunately, I was unable to locate a case that was similar in its facts to this one. In the ñ because in this particular case, things were moving very quickly. The Gouge case, which is a case that's cited in both of the briefs as dealing with the issue of does a gun by itself give you an exigent circumstance to go searching for it, doesn't really quite fit the facts of this case. Here we have a situation where once the gun is thrown, the police officer in charge of the scene had to respond quickly to what he perceived to be the potential threat to the police officers, as well as to other people in the neighborhood, as well as what police officers believed that under the circumstances was the very real possibility that that gun would be found somewhere on the other side of the house by somebody and disappear. So the officers who responded to the situation were responding to a need to act quickly. And they did so. And that's how ultimately they find the gun within 20 minutes, sometime between 10 and 20 minutes after the incident got started. Why do they need to act quickly if they have the backyard surrounded or the house surrounded? Well, it's an unfolding set of circumstances, Your Honor. The first two police officers have arrived on the scene. So the main event is they run down the sidewalk, the gun gets thrown, and ultimately they move into position. In a matter of minutes, other police officers arrive as well. And ultimately, there are a larger number of police officers on the scene. But as that situation is unfolding, the gun remains somewhere in an unknown location, in a neighborhood perceived reasonably by the officers to be one where that is not a good situation to have. And the defendant and other unknown people are inside the house. And so if this search had gone on for a great deal longer or an hour or some unknown length of time greater than it did, then other questions would have to be raised as to, you know, what was the reasonable thing to do at that point. But given what was going on when they arrived on the scene and what they could do and were in a position to do and what they felt they needed to do, both to protect themselves from individuals in the house, from the disappearance of the evidence or its use against them or others in the neighborhood. The standard, is it reasonableness? Your Honor, the standard on, in terms of accident circumstances, is, and I'm citing the O'Hara case, which is not in the briefs, but it's police officers acting on probable cause and in good faith reasonably believe from the totality of the circumstances that the rest of the argument. So it's not a subjective standard in terms of what they're believing, but there is a reasonableness standard in their assessment of circumstances and how that bears on what they should do next. If they didn't go look for the gun, was there, assume that they had the place cordoned off or could have had it circled, was there a risk that the gun would be retrieved from the yard and used against them? If they had gone through the whole process of cordoning off the yard and taken all of those measures, ultimately they would have been able to determine what that risk was. As the events were unfolding, however, the officers did not know precisely where the gun was, what the circumstances in the backyard were in terms of entrances or exits from the house or other people there or really anything at all about the backyard. I just want to understand this. Would they know whether somebody in the house could go out into the backyard and grab the gun if it's laying in the yard and then come back out of the front with guns blazing? They would not have known that until they actually tromped through the backyard to determine what was there in the way of entrances and exits. So Mr. Howard throws the gun and then runs into the house? That's correct. And there's some other people known to be in the house, but the police don't know exactly what means there are to get from the house into the yard? Other than Mr. Howard being in the house, the police don't know who or what's going on inside the house, nor do they know whether that house has a back entrance or what the fence situation is like or how it abuts to the other. They don't really know anything at all about the backyard of that house until they actually go through. What else now? I guess what's relevant is what they knew then. And what they knew then about the backyard of that house was nothing. Okay. Your Honors, the issue of exigent circumstances is clearly an important one here, in that the Court has found, and on this, the defense and their papers indicate that there isn't any agreement. The Court observed or concluded in reaching its determination on exigent circumstances that the factors that were important to it were that the defendant at the time was not in custody. He was in the house. The gun was tossed into an unfamiliar location. That is to say unfamiliar to the police officers arriving. The precise location of the gun was unknown. What the police officer saw was the gun sailing over the roof of the house. It could have landed directly next door or an alley. It could have gone any number of places. The first obvious place to look was behind the house. The Court found that the neighborhood was one with a significant gang presence. This particular block, the 700 block of East 97th Street, the officers' record contains information to the effect, was it had a particular concentration of members of the gang, which was the victim gang of the shooting that had taken place a couple of weeks before, where two young people were killed. One of them was a gang member. Another believed to be a gang associate. There had been a firearm arrest next door. This is all pretty well set forth in the brief. In that case, Your Honor, if there are no further questions, I'll submit on the argument and on the briefs. Thank you. The case just argued is submitted for decision. We'll hear the next case, which is Watek v. Wu.
judges: Schroeder, Gould, Clifton